15-1688, 15-1726
*Upstate Citizens for Equality v. United States of America*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: May 3, 2016     Decided: November 9, 2016)

Docket Nos. 15-1688, 15-1726

UPSTATE CITIZENS FOR EQUALITY, INC., DAVID BROWN VICKERS, RICHARD TALLCOT, SCOTT PETERMAN, DANIEL T. WARREN, TOWN OF VERNON, NEW YORK, TOWN OF VERONA, ABRAHAM ACEE, ARTHUR STRIFE,

*Plaintiffs-Appellants,*

–v.–

UNITED STATES OF AMERICA, INDIVIDUALLY, AND AS TRUSTEE OF THE GOODS, CREDITS AND CHATTELS OF THE FEDERALLY RECOGNIZED INDIAN NATIONS AND TRIBES SITUATED IN THE STATE OF NEW YORK, SALLY M.R. JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE INTERIOR, MICHAEL L. CONNOR, IN HIS OFFICIAL CAPACITY AS DEPUTY SECRETARY OF THE U.S. DEPARTMENT OF THE INTERIOR AND EXERCISING HIS DELEGATED AUTHORITY AS ASSISTANT SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS, ELIZABETH J. KLEIN, IN HER OFFICIAL CAPACITY AS ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR,

*Defendants-Appellees.*[*]

B e f o r e :

LIVINGSTON, CHIN, AND CARNEY, *Circuit Judges.*

---

[*] The Clerk of Court is directed to amend the caption as shown above.

---

The Indian Reorganization Act of 1934 authorizes the federal government to take land into trust on behalf of Indian tribes. Plaintiffs-Appellants—two towns, a civic organization, and several residents of central New York state—challenge the federal government's 2008 decision to take approximately 13,000 acres of land in central New York into trust on behalf of the Oneida Indian Nation of New York (the "Tribe"). The District Court granted summary judgment for the federal government defendants. On appeal, Plaintiffs contend that the land-into-trust procedures are unconstitutional, and, in the alternative, that the government's exercise of those procedures on behalf of the Tribe exceeded its authority under the statute. We disagree, and conclude that the entrustment procedures lie within the federal government's plenary authority over Indian affairs and do not run afoul of the Constitution's Enclave Clause. We further decide that the Oneida Indian Nation of New York is eligible as a "tribe," within the meaning of 25 U.S.C. §§ 465 and 2201(1), to be the beneficiary of such an entrustment.

AFFIRMED.

---

DAVID BROWN VICKERS, Fayetteville, NY, *for Upstate Citizens for Equality, Inc., David Brown Vickers, Richard Tallcot, Scott Peterman and Daniel T. Warren.*

CORNELIUS D. MURRAY, O'Connell and Aronowitz, Albany, NY, *for Town of Vernon, Town of Verona, Abraham Acee and Arthur Strife.*

J. DAVID GUNTER II (John C. Cruden, Steven Miskinis, Jennifer Turner, *on the brief*), United States Department of Justice, Washington, DC, *for United States of America, individually, and as trustee of the goods, credits and chattels of the federally recognized Indian nations and tribes situated in the State of New York, Sally M.R. Jewell, in her official capacity as Secretary of the U.S. Department of the Interior, Michael L. Connor, in his official capacity as Deputy Secretary of the U.S. Department of the Interior and exercising his delegated authority as Assistant Secretary of the Interior for Indian Affairs, Elizabeth J. Klein, in her official capacity as*

*Associate Deputy Secretary of the Interior for Indian Affairs, United States Department of the Interior.*

---

SUSAN L. CARNEY, *Circuit Judge*:

This case is the latest in a long line of lawsuits in our Circuit regarding the efforts of the Oneida Indian Nation of New York ("the Tribe") to assert tribal jurisdiction over a portion of its indigenous homeland in central New York State.[1] After the Supreme Court rejected the Tribe's claim to existing, historically-rooted jurisdiction over a portion of the homeland, *see City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005), the Tribe requested that the United States take approximately 17,000 acres of Tribe-owned land into trust on its behalf in procedures prescribed by § 5 of the Indian Reorganization Act of 1934. The entrustment that the federal government approved in 2008 gave the Tribe jurisdiction over approximately 13,000 acres of land in central New York, allowing the Tribe, among other things, to continue to operate its Turning Stone casino in Verona, New York.

Plaintiffs-Appellants—two towns, a civic organization, and several residents of the area near the trust land—filed these lawsuits in an attempt to reverse the land-into-

---

[1] We will use the term "Tribe" in this Opinion to refer only to the Oneida Indian Nation of New York, the federally-recognized tribe based in central New York. *See Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 144 n.1 (2d Cir. 2003), *rev'd*, *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 221 (2005). We use "Oneidas" or "the Oneida Nation" to refer to the historic tribe of which the present-day Tribe is a descendant. *Id.* at 146.

trust decisions. They now appeal from judgments of the Northern District of New York (Lawrence E. Kahn, *J.*), granting the summary judgment motions of Defendants-Appellants, the United States and several federal officials.[2] The District Court rejected Plaintiffs' claims that the land-into-trust procedures are unconstitutional and that certain provisions of the Indian Land Consolidation Act ("ILCA"), adopted in 1983, bar the United States from taking land into trust for the Tribe.

We agree with the District Court that the entrustment procedure generally, and this entrustment in particular, lie within the federal government's long-recognized "plenary" power over Indian tribes: Neither principles of state sovereignty nor the Constitution's Enclave Clause—which requires state consent for the broadest federal assertions of jurisdiction over land within a state—prevents the federal government from conferring on the Tribe jurisdiction over these trust lands. We further hold that the Oneida Nation of New York is eligible as a "tribe" within the meaning of 25 U.S.C. §§ 465 and 2201(1) for land to be taken into trust on its behalf.[3] Accordingly, we AFFIRM the judgments of the District Court.

---

[2] The Tribe is not a party to either of these cases. It moved, however, for leave to file an amicus brief in this consolidated appeal. *Upstate Citizens for Equality v. United States*, No. 15-1688, Doc. 124 (filed Jan. 29, 2016). The motion is hereby granted.

[3] Effective September 1, 2016, certain provisions from Chapter 14 of Title 25 of the United States Code have been reorganized and transferred to three new chapters at the end of the Title. *See* Office of the Law Revision Counsel, *Editorial Reclassification Title 25, United States Code*, http://uscode.house.gov/editorialreclassification/t25/index.html. Consistent with the parties'

## I.    Land-into-Trust Procedures (§ 5 of the Indian Reorganization Act)

The origins of this dispute lie in the evolution of federal Indian policy in the late 19th and early 20th centuries.  Beginning in the late 19th century, Congress began to partition tribal lands and allocate parcels to individual Indians in a policy known as "allotment."  *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 253-54 (1992).  As the Supreme Court has described, "[t]he objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large."  *Id.* at 254.  In the years in which the allotment policy was followed, Congress also stripped tribes of their authority to govern themselves, instead providing that Indians residing on allotted lands would eventually be subject to state civil and criminal jurisdiction.  *Id.* at 254-55.

Because Indians could still sell their allotted lands to non-Indians, however, "many of the early allottees quickly lost their land through transactions that were unwise or even procured by fraud."  *Id.* at 254.  For this and other reasons, the allotment policy "came to an abrupt end in 1934."  *Id.* at 255.  The Indian Reorganization Act of 1934 ("IRA")—including its § 5, originally codified at 25 U.S.C. § 465—"fundamentally

---

briefs, the District Court's opinions, and prior opinions in this area, we use the original numbering of the Chapter 14 subsections.  For the reader's reference, 25 U.S.C. § 465 is now codified at 25 U.S.C. § 5108; 25 U.S.C. § 478 is now codified at 25 U.S.C. § 5125; and 25 U.S.C. § 479 is now codified at 25 U.S.C. § 5129.

restructured the relationship between Indian tribes and the federal government, reversing the Nineteenth Century goal of assimilation and embodying 'principles of tribal self-determination and self-governance.'" *Connecticut ex rel. Blumenthal v. U.S. Dep't of the Interior*, 228 F.3d 82, 85 (2d Cir. 2000) ("*Connecticut*") (quoting *Cty. of Yakima*, 502 U.S. at 255). The IRA repudiated the allotment policy and aimed to restore to tribes, or replace, the lands and related economic opportunities that had been lost to them under it. *See* Felix S. Cohen, *Handbook of Federal Indian Law* § 15.07[1][a] (2012) ("Cohen, *Handbook*").

The IRA therefore authorized the Secretary of the Interior, in her discretion, to acquire land and other property interests "within or without existing reservations . . . for the purpose of providing land for Indians." Pub. L. No. 73-383, § 5, 48 Stat. 984, 985 (1934) (codified at 25 U.S.C. § 465).[4] "Title to any lands or rights acquired pursuant to this Act," it provides, "shall be taken in the name of the United States in trust for the

---

[4] Early uses of the term "reservation" in the field of Indian law referred to land reserved for Indian use from an Indian cession to the federal or state government. Cohen, *Handbook* § 3.04[2][c][ii]. The term's use later grew to encompass federally protected Indian tribal lands without regard to their legal origins. *Id.* Tribal jurisdiction—that is, the rights of the tribe and the federal government to assert jurisdiction over territory, largely displacing state government—generally follows from the land's reservation status. *See Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 526-27& n.1 (1998). But the legal implications of the term vary: The Supreme Court has held that a state's long-standing exercise of jurisdiction over reservation land can preclude a tribe from reasserting its right to exercise tribal jurisdiction on that reservation land. *See Sherrill*, 544 U.S. at 216-19.

6

Indian tribe or individual Indian for which the land is acquired." *Id.* Land held by the federal government in trust for Indians under this provision "is generally not subject to (1) state or local taxation; (2) local zoning and regulatory requirements; or, (3) state criminal and civil jurisdiction [over Indians], unless the tribe consents to such jurisdiction." *Connecticut*, 228 F.3d at 85-86 (citations omitted). Under the IRA as passed in 1934, tribes were entitled to opt out of its provisions, including the land-into-trust provisions of § 5, by majority vote.[5] *See* Pub. L. No. 73-383, § 18, 48 Stat. 984, 988 (1934) (codified at 25 U.S.C. § 478).

The IRA's implementing regulations, promulgated by the U.S. Department of the Interior, create a process by which tribes and individual Indians can request that the Department take land into trust on their behalf. *See* 25 C.F.R. § 151.9. Upon receiving such a request, the Secretary must provide notice to state and local governments whose rights would be affected by the acquisition and give them an opportunity to respond. *See* § 151.10. In making her final decision, the Secretary is to consider enumerated criteria, including the tribe's need for land "to facilitate tribal self-determination, economic development, or Indian housing," § 151.3(a)(3), and "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls,"

---

[5] As we will discuss below, in 1936 the Oneidas elected to opt out of the IRA by a tribal vote.

§ 151.10(e).  The Secretary is also directed to consider jurisdictional problems and conflicts of land use that would be created by an entrustment.  *Id.*

## II.    Factual Background[6]

For more than four decades, the Tribe has clashed with state and local governments and residents in upstate New York over its efforts to regain governmental authority with respect to a portion of its extensive indigenous homeland.  Prior opinions of this Court and the Supreme Court have detailed the complex history of the relationship between New York and the Tribe, and in particular their disputes regarding the Tribe's jurisdiction over its reservation in central New York.  *See Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 663-65 (1974) ("*Oneida I*"); *Cty. of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 230-32 (1985) ("*Oneida II*"); *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 203-11 (2005) ("*Sherrill*"); *Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 146-52 (2d Cir. 2003) ("*Oneida III*"), *rev'd*, *Sherrill*, 544 U.S. at 221.  We offer only a brief summary of that history here, to provide context for our decision.

The Tribe is a federally recognized Indian tribe and "a direct descendant of the [Oneida Nation], 'one of the six nations of the Iroquois, the most powerful Indian Tribe

---

[6] The relevant facts of this case are undisputed, and the appeal presents only questions of law. We draw this account of the Oneidas' history largely from prior opinions of the Supreme Court and our Court.

8

in the Northeast at the time of the American Revolution.'" *Sherrill*, 544 U.S. at 203

(quoting *Oneida II*, 470 U.S. at 230). The "aboriginal homeland" of the Oneida Nation

"comprised some six million acres in what is now central New York." *Id.* But under the

1788 Treaty of Fort Schuyler, the Oneida Nation ceded "all their lands"—save for a

reservation of about 300,000 acres—to New York State in exchange for payments in

money and in kind. *Id.*

In a pivotal development, "[w]ith the adoption of the Constitution, Indian

relations came exclusively under federal authority." *Oneida III*, 337 F.3d at 146. In the

1790 Nonintercourse Act, Congress prohibited selling tribal land without the

acquiescence of the federal government. *Id.* at 146-47; *see also* 25 U.S.C. § 177 (restricting

alienability of Indian land). Then, in 1794, the federal government entered into the

Treaty of Canandaigua with the Six Iroquois Nations. The Treaty "acknowledge[d] the

Oneida Reservation as established by the Treaty of Fort Schuyler and guaranteed the

Oneidas' free use and enjoyment" of the reservation. *Sherrill*, 544 U.S. at 204-05.

Notwithstanding the Nonintercourse Act and the Canandaigua Treaty, however,

New York State continued to purchase land from the Oneidas, largely without federal

interference. *Id.* at 205. Beginning in 1838, the federal government for a while

encouraged the Oneidas to relocate to a new reservation in Kansas. Although the Tribe

never completely relocated to that site, *id.* at 206, the Oneidas who remained in New

9

York by 1920 owned only 32 acres of the reservation's original 300,000. *Id.* at 207.

Nonetheless, the Oneidas' original reservation was never officially "disestablished." *See*

*Oneida Indian Nation of N.Y. v. Madison Cty.*, 665 F.3d 408, 443-44 (2d Cir. 2011).[7]

In the 1990s, the Tribe began to repurchase New York reservation land in open-

market transactions and to use those lands for various commercial enterprises. In those

years, the Tribe took the position that because the purchased parcels lay within the

boundaries of the reservation originally occupied by the Oneidas, the properties were

exempt from local property taxes. The Tribe opened and operated the Turning Stone

Resort Casino on a portion of the newly-purchased land.

The Town of Sherrill eventually moved to evict the Tribe from land within the

Town's boundaries for nonpayment of property taxes. In response, the Tribe sought an

injunction barring both the eviction and the assessment of property taxes. The District

Court held, and our Circuit agreed, that the Tribe's land was exempt from property

taxes because it lay within the boundaries of the reservation established for it by the

Fort Schuyler and Canandaigua treaties. *See Oneida Indian Nation of N.Y. v. City of*

*Sherrill, New York*, 145 F. Supp. 2d 226, 266 (N.D.N.Y. 2001), *aff'd by Oneida III*, 337 F.3d at

167.

---

[7] Congress may "disestablish" a reservation by enacting a law that makes designated tribal land fully alienable. *See Alaska*, 522 U.S. at 532-33.

10

But the Supreme Court rejected the Tribe's claim, reasoning that the Oneidas had as a practical matter lost rights to their land more than two hundred years earlier. *See Sherrill*, 544 U.S. at 216-17. During those two centuries, state and local governments continuously exercised sovereignty over the putative reservation land, and the character of the land changed dramatically. *Id.* As a result, the Court held, equitable considerations precluded restoration of the Tribe's sovereign rights over land since purchased on the market. *Id.* at 221. The Court pointed out, however, that an alternative was available to the Tribe: "Congress has provided a mechanism for the acquisition of lands for tribal communities that takes account of the interests of others with stakes in the area's governance and well-being." *Id.* at 220. Describing the land-into-trust provisions enacted in § 5 of the IRA, the Court suggested that § 5 offered "the proper avenue for [the Tribe] to reestablish sovereign authority over territory last held by the Oneidas 200 years ago." *Id.* at 221.

On April 4, 2005, almost immediately after the Supreme Court's decision in *Sherrill* and in accordance with the Court's suggestion, the Tribe requested that the Secretary of the Interior take more than 17,000 acres of land in central New York into trust for the Tribe. All of the land was already owned by the Tribe. Its government, health, educational, and cultural facilities were located in the tract, as were tribal housing, businesses, and hunting lands, and the Tribe-operated Turning Stone casino.

11

Three years later, in May 2008, and over the objection of state and local governments, the Department of the Interior announced its decision to accept into trust for the Tribe approximately 13,000 of the 17,000 acres requested. *See* U.S. Dep't of the Interior, Record of Decision: Oneida Indian Nation of New York Fee-to-Trust Request (May 2008) ("Record of Decision"), Joint Appendix ("J.A.") 550-621. The Secretary found that the entrustment was necessary to support tribal self-determination, tribal housing, and economic development. Record of Decision, J.A. 551, 585. It acknowledged that the acquisition "may negatively impact the ability of state and local governments to provide cohesive and consistent governance," *id.*, J.A. 570, and would incrementally increase the demand for local government services, *id.*, J.A. 573. But it concluded that those negative effects did not warrant denying the entrustment. *Id.*

## III.    Procedural History

Plaintiffs-Appellants moved quickly in 2008 to challenge the Secretary's land-into-trust decision in federal district court. *See Upstate Citizens for Equality, Inc. v. United States*, No. 5:08-cv-633 (N.D.N.Y., filed June 16, 2008); *Town of Verona v. Salazar*, No. 6:08-cv-647 (N.D.N.Y., filed June 19, 2008).[8] Invoking federal jurisdiction pursuant to the

---

[8] New York State and Madison and Oneida Counties filed a similar challenge to the agency's decision. That lawsuit was settled in 2014. *See New York v. Jewell*, No. 6:08-cv-644, 2014 WL 841764, at *8-12 (N.D.N.Y. March 4, 2014) (approving settlement). Plaintiffs in this case unsuccessfully sued in state court to invalidate the *Jewell* settlement in state court, *see Town of Verona v. Cuomo*, 22 N.Y.S.3d 241, 246 (App. Div. 3d Dep't 2015), *leave to appeal denied by Town of Verona v. Cuomo*, 27 N.Y.S.3d 908 (2016).

Administrative Procedure Act, 5 U.S.C. § 702, Plaintiffs contended that the statutory

land-into-trust mechanism exceeds the federal government's constitutional authority

and unlawfully infringes on state sovereignty. The Verona and Vernon Plaintiffs also

argued that the Department's statutory authority does not extend to taking land into

trust for the Tribe.

In the following year, while the challenges were still pending, the Supreme Court

issued its decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009). In *Carcieri*, the Court held

that only tribes "under federal jurisdiction" when the land-into-trust law was passed in

1934 are eligible to avail themselves of the entrustment procedures. *Id.* at 381. The

District Court in the litigation now before us accordingly remanded these cases to the

Department for an initial determination of whether the Oneidas were "under federal

jurisdiction" in 1934. *New York v. Salazar*, No. 6:08-cv-644, 2012 WL 4364452, at *14

(N.D.N.Y. Sept. 24, 2012). And, in December 2013, the agency issued an addendum to

its Record of Decision on the Tribe's entrustment request, ruling that the Oneidas were

indeed "under federal jurisdiction" in 1934. J.A. at 810.[9]

The government moved for summary judgment in both cases, asserting the

legality of the land-into-trust decision under both the Constitution and the applicable

statutes, and its availability with respect to the Tribe. The District Court granted the

---

[9] Plaintiffs contested that determination before the District Court, but do not press the challenge on appeal.

motions. *Town of Verona v. Salazar*, No. 6:08-cv-647, 2009 WL 3165556, at *2-4 (N.D.N.Y. Sept. 29, 2009); *Upstate Citizens for Equality v. Jewell*, No. 5:08-cv-0633, 2015 WL 1399366, at *7 (N.D.N.Y. March 26, 2015). The court ruled that Congress's power under the Indian Commerce Clause encompassed taking the land into trust for the Tribe, and that principles of state sovereignty did not prevent the action. The court further held that New York's consent to the entrustment was not needed because the federal government did not fully oust the state of jurisdiction over the entrusted lands, and therefore the Constitution's Enclave Clause was not implicated. *Jewell*, 2015 WL 1399366, at *8-9. The court rejected the Verona Plaintiffs' argument that the federal government could not take land into trust for the Tribe because the Oneidas had opted out of qualifying for that remedy in 1936. *Salazar*, 2009 WL 3165556, at *9-11. And the court held that Plaintiff Upstate Citizens for Equality ("UCE") lacked standing to dispute the legitimacy of the Tribe's leadership in the context of its legal attack on the land-into-trust decision. *Jewell*, 2015 WL 1399366, at *9.

The instant appeals followed.

**DISCUSSION**

Plaintiffs challenge the Secretary's decision to take land into trust on behalf of the Oneida Tribe of New York as violative of the Constitution, the Indian Removal Act, and the Indian Land Consolidation Act. We review *de novo* the District Court's rejection of

14

those legal arguments on summary judgment. *See Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 279 (2d Cir. 2015).

## I.  Standing

As a threshold matter, the government contends that Plaintiff UCE lacks standing to challenge the land-into-trust decision on appeal because it has dropped some of the claims it pursued before the District Court, where its standing was undisputed.[10]

Standing is an "irreducible constitutional minimum" that must be satisfied for a federal court to exercise jurisdiction over a case. *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir. 2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  To establish standing, a plaintiff must show (1) that it "suffered an injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal quotation marks omitted).  An "injury in fact" consists of "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal citations and quotation marks omitted).

---

[10] The government makes no challenge to the standing of the Towns or the individual Plaintiffs-Appellants.

UCE asserts that it has standing to challenge the Secretary's action based on harms that it contends are or will be caused to its members by the Tribe's assertion of jurisdiction over the entrusted land. Among other harms, its complaint asserts that the casino's continued operation on the entrusted land will cause its members "loss of enjoyment of the aesthetic and environmental qualities of the agricultural land surrounding the casino site," "loss of tax revenue currently generated by the agricultural land that comprises the casino site," and "the loss of business and recreational opportunities, such as retail stores and restaurants, that will be forced out by the casino." UCE First Am. Compl. ¶ III.18, J.A. 292. As relief it seeks, among other remedies, an injunction requiring the government to "take enforcement action" against unlawfully operating casinos—presumably including Turning Stone. *Id.* ¶ VI.18, J.A. 343.

The government argues that these alleged injuries no longer confer standing on UCE because the group has now abandoned its claim that the Turning Stone casino operates in violation of the Indian Gaming Regulatory Act ("IGRA").[11] On appeal, UCE challenges only the Secretary's decision to take land into trust on behalf of the Tribe. The casino's operation will be lawful regardless of whether the underlying land is taken

---

[11] In the District Court, UCE raised a number of claims under the IGRA, *see Upstate Citizens for Equality, Inc. v. United States*, No. 5:08-cv-633, Doc. 35 at 41-49 (N.D.N.Y. filed Jan. 29, 2009) (amended complaint). On appeal, it has not pursued arguments related to those claims.

16

into trust, the government argues, and therefore UCE lacks standing to pursue this appeal: The casino's operation—on which UCE's asserted harms rest—will be undisturbed no matter how the entrustment decision is resolved.

We disagree with the government that the lawfulness of the casino's operations will not be affected by the result in this case. Under the IGRA, Turning Stone is a Class III casino, meaning that it may offer a wide range of gaming activities. 25 U.S.C. § 2703(8). The IGRA allows Class III gaming activities to be conducted "on Indian lands," however, only if the activities are authorized by "the governing body of the Indian tribe *having jurisdiction over such lands*." 25 U.S.C. § 2710(d)(1)(A)(i) (emphasis added). Thus, as we recently observed, "[A]ny tribe seeking to conduct gaming on land must have jurisdiction over that land." *Chaudhuri*, 802 F.3d at 279. "Jurisdiction," in this context, means "tribal jurisdiction"—"a combination of tribal and federal jurisdiction over land," to the exclusion (with some exceptions) of state jurisdiction. *Id.* at 279-80; *see infra* 29 n.19.

The Supreme Court has already rejected the Tribe's claim that it may exercise tribal jurisdiction over the Turning Stone land without the Department first taking the land into trust on the Tribe's behalf. *See Sherrill*, 544 U.S. at 220-21. Indeed, among the stated purposes of the Department's land-into-trust decision is to "provid[e] a tribal land base and homeland that . . . is subject to tribal sovereignty." Record of Decision,

J.A. 557.[12]  If the land-into-trust decision is reversed, the Tribe will be stripped of tribal

jurisdiction over the Turning Stone casino site, and the Tribe's operation of the casino

may become unlawful.

Because UCE's attack on the land-into-trust decision will have repercussions for

the lawfulness of the Turning Stone casino's operations, and because the organization

has plausibly alleged that the casino's operations cause them injury-in-fact (allegations

that the government does not dispute), we conclude that UCE has standing to pursue

this appeal, and we turn to the merits of the parties' substantive arguments.

## II.    Constitutionality of Land-into-Trust Procedures

### A.  Scope of Constitutional Authority

UCE contends that the federal government lacks authority under the

Constitution to take this land into trust for the Tribe pursuant to § 5 of the IRA.  Their

position is, primarily, that the Indian Commerce Clause does not permit the federal

government to take action with respect to tribes when that action would take place

entirely within a single state.[13]

---

[12] In this context, we understand "tribal sovereignty" to imply "tribal jurisdiction" over the land. *See* Record of Decision, J.A. 570, 604 (discussing effects of restoring tribal jurisdiction over trust land).

[13] The Indian Commerce Clause grants Congress the power to regulate "Commerce . . . with the Indian Tribes."  U.S. Const. art. I § 8, cl. 3.

UCE's argument is at odds with the Supreme Court's longstanding general view that the federal government's power under the Constitution to legislate with respect to Indian tribes is exceptionally broad. *See United States v. Lara*, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'" (quoting *Washington v. Confederated Bands and Tribes of Yakima Nation*, 439 U.S. 463, 470-71 (1979))); *see also Seminole Tribe v. Florida*, 517 U.S 44, 62 (1996) ("[T]he States . . . have been divested of virtually all authority over Indian commerce and Indian tribes."). This expansive power has been understood to originate in two Constitutional provisions: the Indian Commerce Clause, U.S. Const., Art. I § 8, cl. 3, and the treaty power, Art. II § 2, cl. 2. *Lara*, 541 U.S. at 200. Thus, the "central function of the Indian Commerce Clause is to provide Congress with *plenary* power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) (emphasis added). The treaty power, pursuant to which the executive branch entered into treaties with Indian tribes—until 1878, when Congress prohibited the practice—has been construed to give Congress the related authority to legislate in furtherance of those treaties that were lawfully consummated. *Lara*, 541 U.S. at 201. Congress has long used the powers arising under these provisions to legislate extensively in the matter of Indian affairs,

19

including with respect to tribal property rights. *See, e.g., id.* at 202; *see also* Cohen, *Handbook* § 5.01.

UCE urges us to disregard that lengthy line of authority, however, and instead to import restrictions developed with respect to the *Interstate* Commerce Clause into the Indian Commerce Clause context. In particular, UCE contends that Congress's "plenary" authority to legislate with respect to Indian tribes—analogous to Congress's power vis-à-vis interstate commerce—is limited to the regulation of trading activities that cross state borders. Under UCE's theory, if an Indian tribe's lands are (like the Tribe's) located entirely within the boundaries of a single state, then that tribe is subject to state legislation only.

This argument has some superficial appeal. The two commerce-related provisions are tightly intertwined in the constitutional text:

> The Congress shall have Power . . . To regulate Commerce
> with foreign Nations, and among the several States, and
> with the Indian Tribes.

U.S. Const. art. I § 8, cl. 1, 3. And some historical research suggests that the contemporaneous understanding may have been that Congressional authority over Indian affairs was not so expansive as the word "plenary" suggests. *See Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2569-70 (2013) (Thomas, *J.*, concurring) (arguing that ratifiers of Constitution understood Indian Commerce Clause to regulate only "trade

20

with Indian tribes living beyond state borders"); Robert Natelson, *Original Understanding of the Indian Commerce Clause*, 85 Denv. U. L. Rev. 201, 243-44 (2007) (arguing that Indian Commerce Clause confers power only to regulate trade with Indian tribes).

But the Supreme Court has already rejected the proposed correspondence between the Interstate and Indian Commerce Clauses. In its 1989 decision in *Cotton Petroleum Corp.*, the Court observed that the purpose of the Interstate Commerce Clause was to "maintain[] free trade among the States even in the absence of implementing federal legislation," whereas the purpose of the Indian Commerce Clause was to "provide Congress with plenary power to legislate in the field of Indian affairs." 490 U.S. at 192. Consistent with those purposes, the Court explained, Interstate Commerce Clause case law "is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." *Id.* On this reasoning, the Court concluded that the Indian Commerce Clause does not contain an implicit "interstate" limitation. Although Justice Thomas has urged a more restrictive reading of the Clause in recent concurrences, *see, e.g.*, *Adoptive Couple*, 133 S. Ct. at 2569-70 (Thomas, *J.*, concurring); *Lara*, 541 U.S. at 224-26 (Thomas, *J.*, concurring), the Supreme Court majority has continued to adhere to the

21

view that the Indian Commerce Clause vests Congress with plenary power over Indian tribes and that this power is not delimited by state boundaries.[14]

UCE argues in the alternative that § 5 is unconstitutional because the acquisition of land for Indian use is not a "regulat[ion] [of] commerce" within the meaning of the Indian Commerce Clause. Again, however, precedent deprives this argument of any traction. The Supreme Court has ruled that Congress may purchase or exercise eminent domain over land within state boundaries as an exercise of its general constitutional power to regulate commerce. *See Monongahela Navigation Co. v. United States*, 148 U.S. 312, 335-37 (1893); *Cherokee Nation v. S. Kansas Ry. Co.*, 135 U.S. 641, 656-59 (1890). Further, the Court has established that, when exercising Indian Commerce Clause powers, the federal government may, by acquiring land for a tribe, divest a state of important aspects of its jurisdiction, even if a state previously exercised wholesale jurisdiction over the land and even if "federal supervision over [a tribe] has not been continuous." *United States v. John*, 437 U.S. 634, 653 (1978) (limiting state criminal

---

[14] UCE makes a related argument that, even if the Indian Commerce Clause permits land to be taken into trust in some states, it does not apply in New York because of the nature of New York's pre-Constitution dealings with Iroquois tribes. UCE Br. at 33. This position was rejected by the Supreme Court in *Oneida I*, however. *Oneida I* made clear that, for Indian Commerce Clause purposes, the Court will draw no distinction between the federal government's power vis-à-vis the original states (and New York in particular) and all other states. *See Oneida I*, 414 U.S. at 670; *see also New York Indians*, 72 U.S. (5 Wall.) 761, 771-72 (1866) (voiding New York's taxation of Seneca reservation land).

jurisdiction over reservation land); *see also* Cohen, *Handbook* §§ 5.02[4], 15.03.  We

therefore reject this alternative argument as well.

## B.  State Sovereignty

Both groups of Plaintiffs contend that, even if permitted under Congress's broad

Indian Commerce Clause powers, the land-into-trust procedures violate underlying

principles of state sovereignty.[15]  When the federal government takes land into trust for

an Indian tribe, the state that previously exercised jurisdiction over the land cedes some

of its authority to the federal and tribal governments.  The parties disagree about

whether, by implicitly requiring that cession, the entrustment unconstitutionally

infringes on New York's sovereign rights.

Principles of state sovereignty do impose some limits on Congress's power,

otherwise plenary, over Indian affairs.  Thus, in *Seminole Tribe v. Florida*, 517 U.S 44

(1996), the Supreme Court considered whether Congress could permit Indian tribes to

sue a state and its officials in federal court to enforce the state's duty to negotiate with

the tribe "in good faith" regarding a tribal-state gambling compact.  *Id.* at 50.  The state

---

[15] As noted above, New York State has settled its own challenge to the lawfulness of the land-into-trust decision and no longer contends that the entrustment violates its sovereignty. *See New York v. Jewell*, 2014 WL 841764, at *8-12.  This development does not eliminate Plaintiffs' standing to raise these arguments, however, because "an individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Bond v. United States*, 564 U.S. 211, 222 (2011).

maintained that to allow such a federal-court remedy would violate the Eleventh Amendment's directive that "[t]he Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. The Court agreed: "Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Seminole Tribe*, 517 U.S. at 72.

The linchpin of the decision in *Seminole Tribe*, however, was the Eleventh Amendment's express protection of the states from the unconsented-to exercise of federal judicial power. No equivalent constitutional provision shields the states' exercise of jurisdiction over Indian land within their borders. To the contrary, "[t]he States' inherent jurisdiction on reservations can of course be stripped by Congress." *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) (citing *Draper v. United States*, 164 U.S. 240, 242-43 (1896)); *see also* 18 U.S.C. § 1152 (creating exclusive federal and Indian jurisdiction for criminal offenses committed in "Indian country"[16]).

---

[16] As used in § 1152, the phrase "Indian country" means, in sum: all land on any Indian reservation that is under federal jurisdiction, whether or not the fee owner is an Indian; dependent Indian communities; and Indian allotments whose Indian titles have not been extinguished. *See* 18 U.S.C. § 1151 (defining "Indian country" for certain criminal law purposes); *Cty. of Yakima*, 502 U.S. at 260.

The Supreme Court's 1978 decision in *United States v. John* is instructive in this regard. *John* concerned whether the federal government, the Mississippi state government, or both, had jurisdiction to prosecute a Choctaw man for a violent crime committed against a non-Indian on a Choctaw reservation in Mississippi. *John*, 437 U.S. at 635-38. The dispute arose because the federal government had in the 19th century removed many—although not all—of the Choctaws from their traditional homeland in Mississippi. *Id.* at 639-41. Following the removals, the state of Mississippi exercised civil and criminal jurisdiction over the tribe's former territory and those Choctaws who remained there. *Id.* at 639-40. Decades later, in the 1920s, the federal government began to purchase land in Mississippi for use by those remaining Choctaws, eventually declaring that the land thus acquired would be held "in the United States in trust for" the tribe and proclaiming the land to be a "reservation." *Id.* at 644-46. Despite the federal proclamation, Mississippi claimed continuing criminal jurisdiction over the Choctaw lands. *Id.* at 651-52.

In an argument similar to that made by Plaintiffs here—although not framed precisely in terms of state "sovereignty"—Mississippi asserted that the federal government lacked the power to displace state criminal law authority over the new reservation lands. It contended that "since 1830 the Choctaws residing in Mississippi have become fully assimilated into the political and social life of the State, and . . . the

25

Federal Government long ago abandoned its supervisory authority over these Indians." *Id.* at 652. As a result, Mississippi urged, the state had established an irrevocable right to exercise criminal jurisdiction over the tribe's former territory. *Id.*

The Supreme Court conclusively rejected this argument. "[T]he fact that federal supervision over [the Choctaws] has not been continuous" does not "destroy[] the federal power to deal with them," it declared. *Id.* at 653. Because the land had once been "set apart for the use of the Indians as such, under the superintendence of the Government," *id.* at 649, the federal government retained the power (the Court held) to oust the state of criminal jurisdiction over the territory and to assert federal criminal jurisdiction there. *Id.* at 654.

The Court's reasoning in *United States v. John* comports with its later favorable assessment—albeit in *dicta*—of the land-into-trust procedure and the procedure's "sensitiv[ity] to the complex interjurisdictional concerns that arise" when land is transferred from state to tribal authority. *Sherrill*, 544 U.S. at 220-21. We therefore conclude that underlying principles of state sovereignty do not impair the federal government's power under the IRA to acquire land on behalf of the Tribe even if, by doing so, New York's governmental power over that land is diminished.

26

## C. The Enclave Clause

Plaintiffs' final constitutional challenge rests on text that is known as the Enclave Clause. This rarely invoked constitutional provision provides that Congress has the following power:

> [to] exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings.

U.S. Const. art I § 8, cl. 17.[17] The clause is intended to ensure that "places on which the security of the entire Union may depend" are not "in any degree dependent on a particular member of it." *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 530 (1885) (quoting The Federalist No. 43 (James Madison)). Plaintiffs argue that, in its essence, the clause requires Congress to obtain the state legislature's express consent—as it typically does when establishing a military base in a state, for example—before it can take state land into trust for Indians. Although in deciding whether to take land into trust, the Department of the Interior must take into account the effects of the

---

[17] Although the clause speaks of land to be "purchased" by the federal government, the clause's reach is not cabined to land that is "purchased . . . in the narrow trading sense of the term." *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372 (1964). Instead, "the crucial question" in assessing the legality of such an acquisition is whether the state freely ceded its jurisdiction over the land. *Id.*

entrustment on state and local government, *see* 25 C.F.R. § 151.10, neither the IRA nor its associated regulations currently require the state's express consent to the entrustment.

Case law construing the clause instructs that state consent is needed only when the federal government takes "exclusive" jurisdiction over land within a state. *See Paul v. United States*, 371 U.S. 245, 263 (1963). "Exclusive" jurisdiction for Enclave Clause purposes is equivalent to the sweeping power that Congress exerts over the District of Columbia, the first subject of the clause. *Id.* After exclusive jurisdiction is assumed, newly-enacted state laws have no effect on the federal enclave.[18] *See Pacific Coast Dairy, Inc. v. Dep't of Agric. of Cal.*, 318 U.S. 285, 294 (1943). But federal control is not exclusive—and state consent is *not* needed—when the state in which the federal property sits is, for instance, "free to enforce its criminal and civil laws on those lands." *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976).

When land is taken into trust by the federal government for Indian tribes, the federal government does not obtain such categorically exclusive jurisdiction over the entrusted lands. *See Surplus Trading Co. v. Cook*, 281 U.S. 647, 650-51 (1930) (Indian reservation is not federal enclave because state civil and criminal laws still apply to non-

---

[18] State laws in place at the time of the federal government's acquisition of the land may remain in effect, however, as long as they do not interfere with "the carrying out of a national purpose." *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 103-04 (1940). This saving principle ensures "that no area however small will be left without a developed legal system for private rights." *Id.* at 100.

Indians); *see also Carcieri v. Kempthorne*, 497 F.3d 15, 40 (1st Cir. 2007) (Enclave Clause does not bar application of IRA land-into-trust procedures), *rev'd on other grounds*, *Carcieri*, 555 U.S. at 395-96. States retain some civil and criminal authority on reservations, subject to the caveat that in exercising that authority they may not "infringe[] on the right of reservation Indians to make their own laws and be ruled by them." *Fisher v. Dist. Court of Sixteenth Judicial Dist. of Mont.*, 424 U.S. 382, 386 (1976) (per curiam). States may, for instance, require Indians to collect state sales taxes on goods sold on the reservation to nonmembers. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 151, 159-60 (1980). Also, their agents may enter the reservation to execute a search warrant related to off-reservation conduct. *Hicks*, 533 U.S. at 364-65.[19]

---

[19] Plaintiffs assert that our recent decision in *Citizens Against Casino Gambling v. Chaudhuri*, 802 F.3d 267 (2d Cir. 2015), holds that the state retains no jurisdiction at all over land taken into trust, and thereby means that the consent requirement of the Enclave Clause must apply to the taking of land into trust. Verona Reply Br. at 8-9. In *Chaudhuri*, quoting language from the Cohen *Handbook*, we observed that "[b]ecause of plenary federal authority in Indian affairs, there is no room for state regulation." *Id*. at 280 (quoting Cohen, *Handbook* § 6.03[1][a]). Although read literally this declaration appears to be unqualified, the *Handbook* makes clear that it is in fact subject to exceptions, including that states may continue to regulate the activities of nonmembers on tribal land, and that states may demand assistance from tribal members in the exercise of that regulatory authority. *See* Cohen, *Handbook* § 6.03[1][b]; *see also Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463 (1976) (upholding state regulation requiring smoke shops located on Indian reservation to collect cigarette tax from sales to non-Indians). We do not read *Chaudhuri* to suggest otherwise. The relevant portion of our decision in *Chaudhuri* concerned whether a particular piece of land was subject to tribal jurisdiction *at all*, not the extent or existence of the state's authority on tribal land. For that reason, we decline to treat the quoted portion of *Chaudhuri* as dispositive of the Enclave Clause question at issue here.

State jurisdiction is thus only reduced, and not eliminated, when the federal government takes land into trust for a tribe. Because federal and Indian authority do not wholly displace state authority over land taken into trust pursuant to § 5 of the IRA, the Enclave Clause poses no barrier to the entrustment that occurred here.

## III. Tribe's Eligibility for Land-into-Trust Procedures

Plaintiffs' remaining arguments challenge the government's interpretation of the terms "Indians" and "tribe" in the IRA and related statutes. In their view, the Oneida Indians of New York are not a "tribe" eligible to be the beneficiary of land taken into trust by the United States, both because they are excluded from the benefits of the IRA by the terms of that 1934 statute, and because the language of the 1983 Indian Land Consolidation Act does not reach them.

### A. Definitions of "Tribe"

We begin by reviewing the applicable statutes. As noted above, § 5 of the IRA authorizes the Secretary of the Interior to acquire land in trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. The statute defines "Indians" for purposes of this section as "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction"; it defines "tribe" as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." 25

30

U.S.C. § 479.[20]  At the time of its enactment, tribes could opt out of the IRA's provisions,

including § 5, by vote at a special election.  *See* 25 U.S.C. § 478.  As we have mentioned,

the Oneidas did so in 1936 by a tribal vote.

In 1983, however, acting in response to requests by tribes that had earlier opted

out but since changed their views, Congress overrode the tribes' opt-out votes with the

Indian Land Consolidation Act ("ILCA"), Pub. L. No. 97-459, 96 Stat. 2517 (1983)

(codified at 25 U.S.C. §§ 2201, *et seq.*).  The ILCA directs that § 5 of the IRA "shall apply

to *all tribes* notwithstanding the [opt-out] provisions of section 478."  25 U.S.C. § 2202

(emphasis added).  The ILCA further defines "tribes" as "any Indian tribe, band, group,

pueblo, or community for which, or for the members of which, the United States holds

lands in trust."  § 2201(1).

## B.  Applicability of the 1934 IRA to New York Indians

In Plaintiffs' view, Congress did not intend in 1934 to make the New York Indian

tribes eligible for the § 5 land-into-trust procedures established by the IRA.  Those

procedures, they assert, were intended to remedy the specific effects of the 19th-century

allotment policy—and in particular, the Dawes Act of 1887.[21]  The Dawes Act authorized

---

[20] The requirement that a tribe be "now under federal jurisdiction" refers to its status in 1934, when Congress enacted that language as part of the IRA.  *See Carcieri*, 555 U.S. at 395.

[21] The law was formally entitled, "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes."  24 Stat. 388 (1887).

the President to transfer ownership of Indian tribal lands from the tribes to individual Indians in "allotments," in furtherance of the policy we described above. *See* 24 Stat. 388 § 1 (1887). In 1934, responding to the ill effects of the Act, Congress repudiated the allotment policy by adopting the IRA and creating the land-into-trust procedures, giving the federal government a tool with which to reestablish tribal land holdings. *See* Cohen, *Handbook* § 16.03[2][c].

The Oneidas lost their land not through the Dawes Act or the allotment policy, but rather through repeated land sales made by the tribe to New York State in violation of federal law. *See Sherrill*, 544 U.S. at 206-07. But nothing in the IRA's text limits its remedial reach to tribes affected by the Dawes Act. Indeed, the IRA's definition of "Indians" is notably far-reaching: It covers "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479. When Congress intended to exclude a geographic area or a particular tribe from the statute's reach, it did so explicitly. For example, the IRA land-into-trust procedures by their terms do not apply to land in "the Territories, colonies, [and] insular possessions of the United States," except for the then-territory of Alaska. 25 U.S.C. § 473. It also excludes certain named Indian tribes (not including the Oneidas) from some of its provisions. *Id.* That, in contrast, Congress excluded neither New York nor any of its tribes from the statute's reach implies that Congress in fact intended the

IRA—including § 5—to embrace New York and tribes located there, including the Oneidas. *See Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) (applying *expressio unius est exclusio alterius* canon of construction in declining to read additional exceptions into statute). We comfortably conclude that the IRA unambiguously permits the United States to take land into trust for tribes unaffected by the Dawes Act, including tribes in New York.

In reaching this conclusion, we do not rely on the IRA's legislative history, but we note that so much of it as is available provides further confirmation of our conclusion. As UCE points out in its brief, the New York Indians were shut out of the IRA's land-into-trust provisions in an early draft of the bill. *See Hearings Before the Committee on Indian Affairs on H.R. 7902*, 73rd Cong. 133 (1934) (statement of John Collier, Comm'r of Indian Affairs). Commissioner Collier testified that the New York Indians were omitted from the draft because they "[did] not want [land reform] and their condition [was] entirely peculiar." *Id.* But that provision was removed from the bill as "unnecessary and inadvisable" later in the legislative process and replaced with the voluntary opt-out procedure of 25 U.S.C. § 478, which was made available to *all* tribes. *Id.* at 198. The legislative record is thus consistent with our conclusion, based on the text and scheme of the IRA, *see Hess v. Cohen & Slamowitz LLP*, 637 F.3d 117, 120 (2d Cir. 2011), that the

33

IRA contains no implicit exclusion of the New York tribes.  *See Doe v. Chao*, 540 U.S. 614, 622-23 (2004).

## C.  Effect of the ILCA

Even if the IRA as passed applied to the Oneidas, Plaintiffs argue, the ILCA does not override opt-out votes except as to "tribes" "for which, or for the members of which, the United States holds lands in trust."  25 U.S.C. § 2201(1).  Observing that the United States did not hold land in trust for the Tribe in 2008 when the Secretary made the land-into-trust decision, Plaintiffs contend that the Oneidas' 1936 opt-out vote is still valid and that the Tribe is therefore not eligible for the IRA's land-into-trust procedures.

The United States interprets the IRA and the ILCA differently.  The government first contends that the "tribes" referred to in § 2202 of the ILCA (overriding past opt-out votes) should not be limited to groups meeting the narrowest definition of "tribes" presented in § 2201(1) because that reading would incongruously undermine the ILCA's broad remedial purpose.  Section 2201, it says, should instead be governed by the definition of "tribes" set forth in § 479.  It further asserts that its view is embraced by agency interpretations that are entitled to this Court's deference.  *See* 25 C.F.R. § 151.2(b); U.S. Dep't of the Interior, Office of the Solicitor, The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act, at 21 (March 12, 2014); *New York v. Acting E. Reg'l Dir., Bd. of Indian Affairs*, 58 I.B.I.A. 323, 331-34 (2014)

(applying broader definition in context of related land-into-trust decision).[22]  The

government argues second and in the alternative that construing § 2202 in light of a

broader reading of § 2201(1) would similarly restore the Tribe's eligibility for the land-

into-trust procedures of § 465.  It rejects Plaintiffs' reading of § 2201(1) and instead

construes the last clause of § 2201(1) to apply only to the word "community."

### i. Deference to Agency Interpretations

We first consider what, if any, deference we owe to the agency pronouncements

presented in support of the first argument.  We may defer to an agency's interpretation

of the statute it administers only if the statute is ambiguous in relevant part.  *Estate of*

*Landers v. Leavitt*, 545 F.3d 98, 104-05 (2d Cir. 2009).  If, however, the statute "is silent or

ambiguous with respect to the specific issue, the question for the court is whether the

agency's answer is based on a permissible construction of the statute."  *Chevron, U.S.A.,*

*Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  An interpretive regulation

"qualifies for *Chevron* deference when it appears that Congress delegated authority to

---

[22] The government also urges us to affirm the District Court's decision on the basis that, between 2008 (when this lawsuit was filed) and 2013 (when the Department issued its Amended Record of Decision (*see* J.A. 1571)), the United States took land into trust for the Tribe under the "excess real property" provisions of 40 U.S.C. § 523.  *See* Gov't Br. 62-65.  Thus, the government submits, even under Plaintiffs' interpretation of § 2201(1), by 2013 the Tribe was eligible for additional land to be taken into trust pursuant to § 5 of the IRA.  Although we are free to affirm on grounds "not relied upon by the district court," *Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 275 (2d Cir. 1998) (internal quotation marks omitted), we elect not to do so here, and we express no view on the merits of this alternative argument.

the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Estate of Landers*, 545 F.3d at 105.

The agency interpretations identified by the government as bearing on the question do not, upon closer examination, actually address the interplay of the definitions at issue here, even were we to consider them ambiguous. First, the United States contends that it has promulgated its view—that § 2201(1)'s definition of "tribe" does not limit the effect of § 2202—in a regulation adopted pursuant to statute and through notice-and-comment rulemaking, *see* 45 Fed. Reg. 62,034 (Sept. 18, 1980), and therefore that the interpretation is entitled to *Chevron* deference. *See* 25 C.F.R. § 151.2(b) (defining "tribe" for purposes of land-into-trust regulation as "any Indian tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians . . . which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs"). This definition does not, however, purport to define the *scope* of the agency's land-into-trust authority; indeed, the next section of the agency's regulations acknowledges that "[l]and not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status *when such acquisition is authorized by an act of Congress*." 25 C.F.R. § 151.3 (emphasis added).

The origins of the regulation further support our understanding that § 151.2(b) does not interpret the effect of § 2201(1) on the scope of the agency's land-into-trust authority. The regulatory definition of "tribe" set forth in § 151.2(b) has not changed since it was promulgated in 1980, *before* the ILCA's passage in 1983. *See* 45 Fed. Reg. 62,034, 62,036 (Sept. 18, 1980). Moreover, although the DOI has amended the C.F.R. Part 151 "Land Acquisition" regulations on one occasion, in 1995, that amendment did not affect § 151.2(b), and the DOI has not revisited Part 151 regulations in light of § 2202. *See* Land Acquisitions, 45 Fed. Reg. 62,034 (Sept. 18, 1980); 60 Fed. Reg. 32,874 (June 23, 1995). Tellingly, in the Record of Decision, the DOI seemed to rely on the language of § 2202 itself, rather than on any regulation. No one disputes that, in 1980, the government could not take land into trust for tribes that, like the Oneidas, had opted out of the IRA. Accordingly, we decline to treat § 151.2(b) as reflecting a statutory interpretation to which we owe deference.

Second, we find similarly inapt the Solicitor's legal opinion of March 2014 and the decision of the Interior Board of Indian Appeals to which the government also points. Both of these analyses focus on the meaning of "under Federal jurisdiction" in the IRA's definitional provision and the effect of *Carcieri v. Salazar*, 555 U.S. 379 (2009), on the agency's authority to take land into trust. *See* U.S. Dep't of the Interior, The Meaning of "Under Federal Jurisdiction" at 16-20; *State of New York*, 58 I.B.I.A. at 331-34.

The analyses presented in these documents simply do not address the ILCA's definition of "tribe" in § 2201(1) or whether that definition might cabin the effect of the ILCA on the IRA's entrustment procedures.

### ii. Interpreting "Tribe"

Because the agency's proffered interpretations do not answer the question before us in this litigation, we interpret the statutes *de novo*.

In general, "statutory definitions control the meaning of statutory words." *Burgess v. United States*, 553 U.S. 124, 129 (2008) (internal quotation marks omitted). In the ILCA, therefore, absent any indication that this general rule does not hold, *see Lawson v. Suwannee Fruit & Steamship Co.*, 336 U.S. 198, 201 (1949), § 2201(1) defines "tribe" for purposes of § 2202, *cf. Carcieri*, 555 U.S. at 394 n.9 ("[Section] 2201 is, by its express terms, applicable only to Chapter 24 of Title 25 of the United States Code [*i.e.*, the ILCA]."). Thus, a group that lost its eligibility for the land-into-trust procedures of § 465 through its § 478 vote has its land-into-trust eligibility restored by § 2202—which states that § 465 "shall apply to all tribes notwithstanding" § 478—if and only if the group meets the definition of "tribe" in § 2201(1).

As noted above, Plaintiffs argue that the ILCA's definition of "tribe" in § 2101(1)—"any Indian tribe, band, group, pueblo, or community for which, or for the members of which, the United States holds lands in trust"—should be read so that "for

38

which . . . holds land into trust" applies to "tribe, band, group, [and] pueblo," not just "community." Under this reading, a purported tribe would only have its land-into-trust eligibility restored if, at the time the group is seeking to have the United States take land into trust on its behalf, the United States *already* holds land in trust for that group.

We agree with the government that Plaintiffs' reading of § 2201(1) is inconsistent with the ILCA scheme and would produce anomalous results. As the Supreme Court has explained, § 2202, "by its terms[,] simply ensures that tribes may benefit from § 465 even if they opted out of the IRA pursuant to § 478, which allowed tribal members to reject the application of the IRA to their tribe." *See Carcieri*, 555 U.S. at 393-94. Limiting the ILCA's remedial effect to groups for which the United States already held land in trust would be a very strange outcome in light of the ILCA's restorative aim. Plaintiffs' interpretation would mean that the ILCA restores land-into-trust eligibility only to those tribes that, despite having voted under § 478 to *reject* land-into-trust eligibility, somehow did have land held in trust by the government on their behalf.

Instead, we read "for which, or for the members of which, the United States holds lands in trust" in § 2201(1) to apply only to "community." This reading is supported by the last-antecedent rule, most recently reaffirmed in *Lockhart v. United States*, 136 S.Ct. 958, 962 (2016). The District Court relied on this rule to reach the same reading—correctly, we believe. To hold otherwise would both give inadequate weight

39

to the apparent grammar of the sentence, with a serial comma separating "community" from "Indian tribe, band, group, [and] pueblo," and undercut the ILCA's intended effect of restoring land-into-trust eligibility.

To be sure, a tribe that opted out of the IRA must satisfy both the requirements of § 2201(1) and § 465 to have its land-into-trust eligibility restored. And, under our preferred reading, § 2201(1) affords a broader definition of "tribe" than does its counterpart in the IRA, § 479. Section 479 defines "tribe" as "any Indian tribe, organized band, pueblo, or Indians residing on one reservation," but limits the term "Indian" to "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." This definition of "Indian" restricts § 465's application. *See Carcieri*, 555 U.S. at 388 ("The parties are in agreement, as are we, that the Secretary's authority to take the parcel in question into trust [pursuant to § 465] depends on whether the Narragansetts are members of a 'recognized Indian Tribe now under Federal jurisdiction.'"). Section 2201(1) does not repeated this date-sensitive federal jurisdiction requirement. In § 2202, however, Congress took care to note that "nothing in this section is intended to supersede any other provision of Federal law which authorizes, prohibits, or restricts the acquisition of land for Indians with respect to any specific tribe, reservation, or state(s)." *Id.* § 2202. Accordingly, the Secretary must also apply § 479 in determining whether a tribe that has opted out, with that opt-

40

out effectively nullified pursuant to § 2202, is eligible for a land-into-trust arrangement pursuant to § 465. Because the ILCA defines "tribe" and "Indian" more broadly than does the IRA, however, this two-step analysis should not prevent any otherwise eligible tribe, *i.e.*, any recognized tribe under federal jurisdiction at the time of the IRA's enactment, from requesting a land-into-trust arrangement pursuant to § 465.

We therefore conclude that the United States did not exceed its statutory authority by taking land into trust for the Tribe—a tribe that indisputably qualifies as a "tribe" within our reading of § 2201(1) and, since it was under federal jurisdiction in 1934, within the meaning of § 465 as well.

## IV.  Authority of Tribal Leadership

Finally, we reject UCE's cursory argument that the United States may not take land into trust on behalf of the Tribe because of what Plaintiffs allege to be the Tribe's illegitimate leadership. According to UCE, tribal leader Arthur Raymond Halbritter has improperly restructured tribal governance to protect his power base. Plaintiffs do not, however, detail how this assertion bears on their claim that the United States may not take land into trust for the Tribe. They do not, for example, question the validity of the Tribe's request that land be entrusted on its behalf. Moreover, even if the legitimacy of the tribal government were somehow related to Plaintiffs' current claims regarding the entrustment, federal courts "lack authority to resolve internal disputes about tribal

law." *Cayuga Nation v. Tanner*, No. 15-1667, 2016 WL 3093259, at *4 (2d Cir. June 2, 2016). When there is such a dispute, we will "defer to the BIA's recognition of an individual as authorized to act on behalf of the Nation." *Id.* at *6. Here, the agency received and acted on the Tribe's request that it take land into trust, implicitly recognizing—at least for these purposes—the legitimacy of tribal leadership. That ends our inquiry.

## CONCLUSION

In sum, we conclude that the federal government's plenary power over Indian affairs extends to taking historic reservation land into trust for a tribe. That the entrustment deprives state government of certain aspects of jurisdiction over that land does not run afoul of general principles of state sovereignty, the Indian Commerce Clause, or the specific guarantees of the Enclave Clause. The Tribe became eligible for such an entrustment in 1983, when Congress invalidated the Oneidas' earlier decision to opt out of the land-into-trust regime, and the Department of the Interior's 2008 decision (reaffirmed in 2013) to take the land into trust for the Tribe lies within that agency's statutory authority. For these reasons, we **AFFIRM** the judgments of the District Court.