RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0248p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JONATHAN DAVID HEWITT-EL,

                *Petitioner-Appellee*,

    *v.*

MICHAEL BURGESS, Warden,

                *Respondent-Appellant*.

No. 22-1188

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-10652—Sean F. Cox, Chief District Judge.

Argued: October 19, 2022

Decided and Filed: November 18, 2022

Before: SUTTON, Chief Judge; BOGGS and KETHLEDGE, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Matthew A. Monahan, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Matthew A. Monahan, Katherine L. Marcuz, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

KETHLEDGE, Circuit Judge. To recite the facts of this case is nearly to decide it. Here, the State of Michigan convicted Jonathan Hewittel of armed robbery and related offenses based

solely on the testimony of the victim, James Lemon.  Three witnesses—one of them simply a conscientious citizen with little relationship with anyone in the case—were prepared to testify in support of Hewittel's alibi that he was at home, almost a half-hour from the crime scene, when the crime occurred.  Yet Hewittel's trial counsel failed to call any of those witnesses at trial.  That failure was the result not of any strategic judgment, but of a simple mistake of fact:  Hewittel's counsel thought the crime occurred between noon and 12:30 p.m., when Hewittel was at home alone;  whereas the victim twice testified (both times in counsel's presence) that the crime occurred at 1:00 or 1:30 p.m.—by which time all three witnesses were present at Hewittel's home.  Counsel then compounded that mistake of fact with a mistake of law, namely his belief that evidence of Hewittel's prior convictions would have unavoidably come in at trial.  Instead, that evidence almost certainly would have been excluded, if Hewittel's counsel had only asked.  Yet from his opening statement, to his direct and redirect examinations of Hewittel, to his closing argument, Hewittel's counsel reminded the jury again and again—in a case where his client was on trial for armed robbery—that his client had been convicted of armed robbery five times before.

Thereafter the trial judge twice ordered that Hewittel have a new trial, but the Michigan Court of Appeals ultimately reversed—based in part on the same mistake of fact (regarding the time of the offense) that counsel himself had made.  In federal court, the district court granted a writ of habeas corpus to Hewittel.  We affirm.

I.

A.

On Valentine's Day 2010, in Detroit, someone shot James Lemon in the abdomen in the living room of his home.  Lemon escaped through a window and alerted his neighbors, who called 911.  When the police arrived, Lemon said that he had started drinking and smoking marijuana around noon that day, and that Jonathan Hewittel and a man known as "Terry" had joined him around 12:35 p.m.  But Terry soon pulled a gun and demanded that Lemon hand over his money and his own gun.  Lemon responded that he had neither; and (according to Lemon) Hewittel said "shoot him."  Terry then shot Lemon, who jumped through a window to escape.

Three days later Lemon gave the police another statement. This time, he said that Terry had demanded only his money, that Lemon had handed over $600 to the two men, and that Terry (at Hewittel's direction) shot him anyway. The police soon arrested Hewittel, who was charged with armed robbery, being a felon in possession of a firearm, and related offenses.

Hewittel's father or brother asked a family friend, David Cross, to represent Hewittel at his arraignment. Cross agreed and stayed on for the preliminary exam the following month. There, Cross heard Lemon testify that the shooting occurred at "1:30 or 1:45" p.m.—rather than around noon or 12:30—on February 14.

Meanwhile Hewittel's case moved toward a trial date in May. Cross continued as Hewittel's attorney, without charging any fee. Hewittel was being held in the Wayne County Jail, where Cross had no contact with him (apparently because Hewittel was held in a medical unit for part of that time) until the two met about a week before trial. Hewittel told Cross that several people, including his fiancée, Sheila Jackson, could confirm that he was at his own home—rather than across town at Lemon's—when the shooting occurred. By the time of Hewittel's meeting with Cross, however, Michigan's statutory deadline for providing the prosecution with notice of any alibi defense had already passed, at least as to the May trial date, *see* Mich. Comp. Laws 768.20(1); and Cross did not seek an adjournment.

Hewittel's case proceeded to trial in May, only three months after the shooting itself. Before jury selection, Hewittel told the court that he wanted a new attorney, mostly because Cross had not pursued his alibi witnesses, including Sheila Jackson and a woman named "Kelly." Cross then addressed the court, saying that "I have known from the beginning that Mr. Hewitt[el], he has told me from the beginning that he was not there." He added: "I have spoken with Sheila Jackson. And after that conversation, it was my impression that she would not be an alibi witness." Cross continued:

> I have been given other names. And my position has been that those persons either needed to contact me so that I can interview them to determine whether or not they would be alibi witnesses. And the one, it was the gentleman that, in spite of this—Well, first of all, he's not here. And in spite of his testimony, he would not be an alibi witness either.

The court denied Hewittel's motion for a new attorney, and the next morning the parties proceeded with their proofs. Lemon testified that Hewittel and Terry robbed him at gunpoint between 1:00 and 1:30 p.m. on February 14, 2010. Other than Lemon's word, the prosecution presented no other evidence, physical or otherwise, connecting Hewittel to the crime. Cross then delivered his opening statement, which he began by disclosing Hewittel's criminal record: "My client, what we believe the evidence will show, first of all, is that my guy, my client is not a perfect cat. He's got a criminal record. I think you kind of got an indication of that by what's gone on before." Cross continued in this vein when Hewittel took the stand:

> Q: And Mr. Hewitt, let's get right to it. You have been previously convicted of crimes here in the state of Michigan, is that correct?
>
> A: Yes.
>
> Q: And you were incarcerated in prison for those crimes, is that correct?
>
> A: Yes.
>
> Q: And how long did you spend in prison?
>
> A: A total of nineteen years.
>
> Q: Nineteen years. Okay.

After that preamble, Hewittel told the jury his side of the story, testifying that Lemon had called him early that Valentine's Day, asking to buy Vicodin. Hewittel told him to call "Terry" (whose real name was apparently Steve) and gave him a number; Lemon called Hewittel back between 12:00 and 12:30 to say that he had made contact. The following exchange then occurred between Cross and Hewittel:

> Q: Okay. And where were you when he made the second phone call to you?
>
> A: Oh, I was still at home. I was at home—because about 12:30, 12:00 or 12:30 is when I got up to start cooking dinner for my fiancée for Valentine's Day.
>
> Q: Okay.
>
> A: So I was up preparing my food.
>
> Q: And were you, were you with—was there someone else there with you?
>
> A: No. Nobody else was in my home.

Cross never asked Hewittel where he had been between 1:00 and 1:30 p.m. that day, which is when Lemon had testified the shooting occurred—and by which time, Hewittel would

have testified, three other people had joined him at home.  Instead, Cross returned to Hewittel's criminal history:

> Q: Now, you indicated, I believe in the beginning, that you had been convicted of a couple of felonies before, is that correct?
>
> A: Yes.
>
> Q. And how old were you when you committed the and were convicted of the first felony?
>
> A: About twenty-five.
>
> Q: About twenty-five.  And the second?
>
> A: Thirty.
>
> Q: Thirty.  Okay.  And can you tell the jury the circumstances under which you were convicted?

At that point, the court cut off the question, saying "[t]hat's not relevant, sir."

The prosecutor then cross-examined Hewittel and promptly walked through the door opened by his direct testimony.  After confirming that Hewittel had previously been convicted of robbery, the prosecutor led him through the following exchange:

> Q: And how many—was it just one case?
>
> A: No.
>
> Q: How many cases?
>
> A: To my recollection, five.
>
> Q: And was it—What type of robbery? Was it armed robbery?
>
> A: Yes.
>
> Q: Each time?
>
> A: Yes.  It was.
>
> On redirect, Cross immediately returned to the subject of Hewittel's criminal history:
>
> Q: Mr. Hewitt, how long have you been incarcerated for this particular—
>
> The Court: (Interposing) That's not relevant.

Cross then began to ask another question, which the court again cut off as irrelevant.  Then the defense rested.

In closing arguments, the prosecutor said the case turned on Hewittel's credibility; and she suggested that the jury should not believe him, because "out of his own mouth, [he] has been convicted five times of a crime involving theft or dishonesty. And he testified that it was armed robbery." During Cross's closing argument, he agreed that the case "boils down to credibility. Who do you believe?" Cross also emphasized the prosecution's lack of evidence, but referred several times more to Hewittel's criminal record and suggested that Hewittel was "a bad guy." A trial in which the proofs began at 9:15 thus concluded before the lunch break; and after less than an hour's deliberation the jury found Hewittel guilty.

B.

A different attorney, Daniel Rust, represented Hewittel on appeal. In four pages of argument, Rust argued that the trial court had erred by denying Hewittel's request for a new lawyer and by allowing the prosecutor to impeach Hewittel with his prior convictions. The court of appeals rejected those arguments—as to the latter, the court held, Cross's own questioning had opened the door to the prosecutor's questions about Hewittel's criminal record. Rust also argued, in the alternative, that Cross had rendered ineffective assistance when he failed to seek exclusion of those convictions at trial. But the court of appeals held that Rust's brief had "not address[ed] the merits" of that argument, meaning it was "abandoned." *People v. Hewitt*, 2011 WL 4129523, at *4 (Mich. App., Sept. 15, 2011). The Michigan Supreme Court denied leave to appeal.

Hewittel thereafter filed a pro se motion for relief from judgment, claiming among other things that his trial counsel had been ineffective on various grounds. As an exhibit, Hewittel attached a sworn affidavit from Sheila Jackson, who said that, on the day of the offense, she had "returned home from church at approximately 1:15-1:30 p.m. to find Jonnathan [*sic*] and his son Leon outside our apartment building doing something to Leon's truck." Jackson also said that "Mr. Cross told me that I could not be an alibi witness because I could not say where Jonathan was from 12:00-12:45 p.m."; that she had "attempted to supply Mr. Cross with known information and possible locations of Leon, Craig, and Kelly that could clear Jonathan of these charges"; but that "Mr. Cross told me that I needed to have those individuals contact him so that he could determine if he could use them."

The trial court—being the same judge who presided over Hewittel's trial—chose to hold an evidentiary hearing on his motion. On the first day of that hearing, the court heard testimony from Rust and Hewittel's son, Leon. (Despite a subpoena from the defense, Cross did not show.) Rust testified that Hewittel had discussed his alibi with him and that he had tried without success to contact Sheila Jackson. (Hewittel's relationship with her ended at some point after his conviction.) Rust said he had made no attempt to contact any of Hewittel's other witnesses, however, because he had not believed Hewittel's alibi:

> Q: All right. Did you believe defendant's alibi? Did you—
> A: (Interposing) No.
> Q: Why not?
> A: If I recall correctly, according to the testimony, he testified he was home alone at the time this occurred. Therefore, if he had an alibi, it would have contradicted his sworn testimony.

Hence Rust too was mistaken about the time of the crime: based on Hewittel's testimony at trial that he was alone during a phone call with Lemon at 12 p.m., Rust rejected Hewittel's assertion that others had joined him by the time of the shooting—which Lemon twice testified had occurred between 1:00 and 1:30 p.m.

At one point, the trial court asked Rust directly about Cross's repeated references to Hewittel's criminal record at trial:

> The Court: Could you understand, at all, why he impeached his own client?
> The Witness: No.
> The Court: And as a practicing attorney, wouldn't you say that that was one of the most asinine tactics that you had ever seen?
> The Witness: Not one of the most. It was questionable—
> The Court: (Interposing) Certainly, it was, it was a huge one.

Leon testified next, saying that he spent most Sunday afternoons with his father: they'd "go play ball," or his father would "come watch me play basketball." On the Sunday of the shooting, however, Leon went to his father's house because "he knew how to hook up a radio. And I had a pick-up truck and I wanted to get a radio installed." Leon arrived at his father's residence around "12:30, 12:45" in the afternoon and found Hewittel upstairs. They went

outside and worked on his truck together until around 2:00, when Leon left to go to the gym, which opened at 3.

> Leon said that he had told Cross he would testify, but that Cross turned him down:

> Q: Okay.  So, did Mr. Hewitt's lawyer or anyone on behalf of his lawyer ever contact you prior to the trial?

> A: Well, I knew David, well, Mr. Cross.  And I had let him know that I was willing to testify.

> Q: Okay.  Did you tell him, basically, what you said here, that you were at his, at Mr. Hewitt's house?

> A: Yeah.

> Q: And you told him that you were willing to testify?

> A: Yeah.

> Q: And what did Mr. Cross tell you?

> A: He said he didn't want to put me on the stand because he thought I would lie for him.

The court scheduled a second day of testimony, to hear from Cross and Hewittel's other witnesses.  This time, Cross appeared, but—despite having five months' notice of the rescheduled hearing date—he said he had misplaced his files and remembered little about the case.  Cross acknowledged that Hewittel had given him the names of several alibi witnesses, but reiterated the position he had taken before the trial court:

> Q: And I, I believe you told the trial court that it was up to the witnesses to contact you.  Do you remember saying that?

> A: Well, I may have said that.  Yeah.  And that kind of was my position with Mr. Hewitt, that not having any contact information for these people, someone would have to contact them and have them get in contact with me.

Cross did remember talking to Sheila Jackson.  But he had ruled her out as a witness, he said, because she could not place herself with Hewittel at the time of the crime.  That conclusion was based on the time of the offense in the initial police report—12:35 p.m.—because "at that time, that's all I had."  During questioning by Hewittel himself, however, Cross conceded he had not considered Lemon's testimony at the preliminary examination, which was that the crime

occurred at 1:30 or 1:45 p.m.—about the same time that Sheila had said she came home that day, to find Hewittel and his son outside the apartment building.

The court then heard from Mark McCline—a third party unaffiliated with anyone else in the case—whom a mutual friend had referred to Hewittel as someone who could "put a radio inside my wife's car." McCline said that day was "easy" for him to remember: "It was my first Valentine's [Day] with my wife . . . my wife makes me remember that day." McCline said that he "had an engagement" with his wife at 2 p.m. that day; that he arrived at Hewittel's building "between 12:00 and 12:30"; and that Hewittel finished installing the radio around 1:15 p.m.

McCline also remembered seeing Leon there as Hewittel finished installing the radio:

> A: [A] young man approached as it was practically being completed. [Hewittel] was actually in the car. I'm standing outside the car. The young man approached. I kind of take the position of defense. And [Hewittel] looked up and is like: That's my son. As if to tell me, you know, like this individual I know him, he all right, calm down.

McCline also testified that Sheila had called him "three to five times" to discuss his willingness to testify at trial:

> A: Actually, Sheila called me as an extension, I guess, of his investigation part and was asking me would I be willing to talk to a lawyer, this, that and the other. And I really didn't care. I was like, you know: I'll talk to whoever and just—Like it wasn't an inconvenience. Now, it became an inconvenience somewhat because ya'll trial dates kept changing. So, every time, I've got to turn around and have different schedules for my children to be watched and ya'll cancelled. But I'm glad we here today to get this over with now.

But Cross never reached out, and McCline never realized he was expected to do so himself:

> A: . . . I never had an intuitive nature to say, you know, you need to go talk to somebody. I never knew I was valuable to the case or involved in the case or none of that to the degree that make me say: Well, let me go talk to the police. No. . . . Whoever [Sheila] wanted me to meet with never contacted me.

McCline also said that Sheila "was overwhelmed" by the situation, and that he eventually "passed her off" to his wife, "because I really couldn't relate to her, what she's going through." Sheila had the phone number for McCline's wife:

Q: What's your wife's name?

A: Kelly.

Q: And the last name?

A: McCline.

Q: And so, your understanding is that Sheila called Kelly as well?

A: Yes.

Q: Sheila had—so Sheila had Kelly's phone number to call her?

A: Eventually, she got it because I couldn't handle the stress that she presented.

On the final day of the hearing, Hewittel himself testified.  He began by explaining that, before trial, he had seen Cross "twice for two short periods of time, no more than thirty or forty minutes each time."  He reiterated that he had been home alone on the day of the crime until his son and McCline showed up around 12:30:

Q: Now, did somebody come to your apartment after 12:30?

A: Yeah.  Shortly, later on, Mr. McCline showed up as far as with his wife's vehicle for me to put in the CD player.  And he was there for a short while.  And then my son showed up.  And I was supposed to do something with his [truck] and, you know, he, we end up, end up not doing his.  I did Mr. McCline's, but I ain't never, did not do my son's [truck radio].  And then we went back upstairs for a few, for a little while.

. . .

Q: Do you recall about what time it was that he left?

A: My son had to leave between 2:00, 2:00 and 3:00, or between 1:30 or 2:30, between 2:00 and 3:00.

When asked why he did not offer this same testimony at trial, Hewittel explained that Cross had told him to answer only "the questions as I was asked"; and as to Hewittel's whereabouts, Cross had asked him only where he had between "between 12:00 and 12:30."

## C.

The trial court later entered an order granting Hewittel a new trial, finding that Cross had rendered ineffective assistance by opening the door to Hewittel's prior convictions and by failing to investigate alibi witnesses or anything else before trial.  The Michigan Court of Appeals

vacated that order on procedural grounds. *People v. Hewitt*, No. 299241, 2011 WL 4129523 (Mich. App., Sept. 15, 2011).

On remand, the trial court again granted a new trial. As an initial matter (regarding the procedural grounds on which the trial court's earlier order had been vacated), the court held that Rust had been ineffective during Hewittel's direct appeal, by failing to address the merits of his argument that Cross should have sought exclusion of Hewittel's prior convictions at trial. That failure by Rust, the trial court found, resulted in "absolute prejudice to Defendant."

The court then found that Cross had been ineffective, citing his "wholesale failure to advocate for Defendant's interests during trial." Specifically, the court found that "Counsel took the position that the putative witnesses would have to contact him. Counsel did not attempt to hire an investigator to locate the witnesses." The court also found that those witnesses could have been located: "as Sheila was in contact with the McClines, Mark and Kelly"—a name, the court noted, that Hewittel had given to Cross—"further investigation would have led to additional witness(es) who were purportedly willing to testify with regard to Defendant's alibi during the time frame in question." The court also reiterated that Cross's repeated references to Hewittel's prior convictions had amounted to ineffective assistance.

The Court of Appeals again reversed, in part on the mistaken ground that it had already adjudicated the merits of the prior-convictions claim it had deemed "abandoned" in Hewittel's direct appeal. *People v. Hewitt-El,* No. 332946, 2016 WL 6825877 (Mich. App., Nov. 7, 2016). For that reason, the Michigan Supreme Court vacated the Court of Appeals's order and remanded for reconsideration. *People v. Hewitt-El*, 501 Mich. 1031 (2018). The Court of Appeals again reversed the trial court's grant of a new trial. *People v. Hewitt-El*, No. 332946, 2018 WL 2121478 (Mich. App. 2018). The Michigan Supreme Court denied leave to appeal, over the dissents of two justices. *People v. Hewitt-El*, 502 Mich. 907 (2018).

Hewittel then sought habeas relief in federal court, asserting, as relevant here, claims that Cross had been ineffective by opening the door to his prior convictions at trial (the "prior-convictions claim") and by failing to investigate his alibi witnesses (the "alibi-witnesses claim"). The district court found both claims meritorious and granted the writ. This appeal followed.

II.

We review de novo the district court's grant of habeas relief. *Stermer v. Warren*, 959 F.3d 704, 720 (6th Cir. 2020).

A.

As an initial matter, the State argues that Hewittel procedurally defaulted both of his claims in state court. A habeas claim is defaulted—meaning we cannot adjudicate it, absent good cause for the default—if the petitioner's failure to comply with a state procedural rule was an "adequate and independent" ground for the state court's denial of relief on that claim. *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010). To determine whether state courts denied relief on such a ground, we look to the state courts' last reasoned opinion as to the claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991).

Here, the parties agree that the relevant opinion is the last one rendered by the Michigan Court of Appeals, in 2018. *See People v. Hewitt-El*, 2018 WL 2121478. And in light of that opinion, we disagree with the State that the alibi-witnesses claim was defaulted. A state court's denial of relief on a claim is "independent"—for purposes of whether the court denied relief on an "adequate and independent" state ground—if the decision rests on a state-law ground that is "independent of the merits of the federal claim." *Harris v. Reed*, 489 U.S. 255, 260 (1989) (internal quotation marks omitted); *see also, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 753 (6th Cir. 2007) (same). Here, as to the alibi-witnesses claim, the Court of Appeals denied relief on the ground that Cross's "failure to call alibi witnesses was not objectively unreasonable." *People v. Hewitt-El*, 2018 WL 2121478 at *6. That is the standard for deficient performance under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); and that ground thus rested on the claim's merits, as the State itself recognizes in its brief. *See* Br. at 28. That ground was therefore not "'independent' of the merits of the federal claim." *Harris*, 489 U.S. at 260. To the contrary, it was wholly dependent upon them, which means that the state court did not deny relief on an "independent" state ground. Hence the claim was not defaulted for purposes of habeas review. *Id.*

The State makes a better case that the prior-convictions claim was defaulted. As to that claim, the Court of Appeals denied relief on the ground that Hewittel had not shown "actual prejudice" as defined by Michigan Court Rule 6.508(D)(3)(b). That definition, Hewittel agrees, differs somewhat from the definition of prejudice under *Strickland*, 466 U.S. at 694. *See generally Walker v. Hoffner*, 534 F. App'x 406, 412 (6th Cir. 2013) (describing the differences between the two definitions). The state court's ground of decision was thus arguably independent of the merits of Hewittel's federal claim. That ground was also, undisputedly, an "adequate" ground of decision; and on this record nobody disputes that it was procedural. Hence the claim was arguably defaulted.

Yet any default here would be excused. We may consider a claim's merits if its default was itself the result of ineffective assistance of appellate counsel. *See, e.g.*, *Chase v. MaCauley*, 971 F.3d 582, 591-92 (6th Cir. 2020). We decide that issue de novo. *See id*. at 592. Here, the default was the result of Rust's failure to brief the merits of his argument that Cross had rendered ineffective assistance when he failed to seek exclusion of Hewittel's convictions at trial. Rust's failure was ineffective assistance if it amounted to "deficient performance" that prejudiced Hewittel (as that term is defined in *Strickland*). *Strickland*, 466 U.S. at 687. As to deficient performance, neither the State nor anyone else has identified any reason, strategic or otherwise, why Rust would nominally raise the argument that Cross had been ineffective when he failed to seek exclusion of the prior convictions, yet choose not to brief the merits of that argument. Nor is there any colorable argument that briefing those merits would have diluted the force of Hewittel's other arguments or otherwise taxed the court's patience. To the contrary, Rust's brief was threadbare and short to a fault. And the argument's omitted merits were notably strong. Even the Court of Appeals later recognized that Cross had rendered deficient performance by failing to seek exclusion of Hewittel's convictions at trial. Not even the State argues otherwise here. Cross's failure to brief the merits of an argument that was obviously much stronger than the merits of the two claims that he did brief was deficient performance under *Strickland*.

That leaves the issue of prejudice, which turns on whether, absent Rust's failure to brief the merits of this argument, there existed "a reasonable probability" that the outcome of Hewittel's direct appeal would have been different. *See Chase*, 971 F.3d at 595. As an initial

matter, the State's speculation about what the panel of judges in Hewittel's direct appeal would have done with that argument is beside the point. "The assessment of prejudice" is objective, and does not "depend on the idiosyncrasies of the particular decisionmaker." *Strickland*, 466 U.S. at 695.

Here, the existence of prejudice instead depends on whether, in Hewittel's appeal, a reasonable, impartial decisionmaker would have found that Cross's failure to exclude Hewittel's conviction undermined confidence in the verdict. *Id.*; *see Phillips v. White*, 841 F.3d 567, 581 (6th Cir. 2017). The trial itself boiled down to a "one-on-one credibility contest" with Lemon. *People v. Snyder*, 301 Mich. App. 99, 112 (2013). The judge who presided over Hewittel's trial, for his part, found that Cross had "sabotaged his client's credibility." The Court of Appeals later concluded that "[a]llowing the jury to learn that defendant had previously been convicted of armed robbery five times substantially increased the risk of unfair prejudice to the defendant, particularly where defendant was presently charged with armed robbery." 2018 WL 2121478 at *5. In another case, the Court of Appeals also held, in such a credibility contest, that the admission of even a single "prior conviction undermined the reliability of the verdict." *Snyder*, 301 Mich. App. at 112. On de novo review we think an impartial decisionmaker would conclude that—on this record, in a one-on-one credibility contest where the prosecution otherwise lacked any evidence of guilt—counsel's failure to exclude evidence of the defendant's five convictions for armed robbery, when he was on trial for armed robbery, undermined confidence in the verdict.

Rust himself therefore rendered ineffective assistance of counsel when he failed to brief the merits of this issue on direct appeal. That excuses the default of the prior-convictions claim—which means we can consider the merits of both of Hewittel's claims here.

B.

To obtain habeas relief, Hewittel must show that the state court of appeals unreasonably applied Supreme Court precedent, or based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," when it reversed the trial court's grant of postconviction relief. 28 U.S.C. §2254(d). An unreasonable application of

Supreme Court precedent, for purposes of the habeas statute, is one with which no fairminded jurist would agree. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The relevant precedent here is *Strickland v. Washington*, 466 U.S. 668 (1984). There, the Court held that a defendant claiming ineffective assistance must show that his counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

1.

We begin with the question whether Cross's performance "fell below an objective standard of reasonableness." *Id.* at 688. As to the prior-convictions claim, not even the State disputes that Cross's performance was objectively unreasonable when he impeached his own client with five armed-robbery convictions in a trial for armed robbery. Cross admitted he did not "consider moving the Court to suppress" those convictions, explaining that, because Hewittel "was charged with a felon in possession of a firearm . . . [h]is prior, prior criminal convictions would have come out" at trial. But Hewittel had already stipulated to his status as a felon, for purposes of the felon-in-possession charge; and a competent defense lawyer would have known that Hewittel therefore could have excluded, as unfairly prejudicial, evidence that he had multiple felony convictions for the very same offense for which he was on trial. *See People v. Allen,* 429 Mich. 558, 571 (1988); *cf. Old Chief v. United States*, 519 U.S. 172, 191-92 (1997). Cross's decision not to seek exclusion of Hewittel's prior convictions, therefore, resulted simply from a mistake of law on his part. Meanwhile, as noted above, the state court of appeals itself held that "defense counsel's performance fell below an objective standard of reasonableness in that regard." 2018 WL 2121478 at *5. Suffice it to say that we agree.

As for the alibi-witnesses claim, the Supreme Court has made clear that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the

case") (internal quotation marks omitted).  That means Cross had a duty to investigate potential alibi witnesses.

Yet Cross undisputedly did almost nothing to discharge that duty.  Instead he was apparently unaware of it, since he twice told the trial court that—though he had "been given" names of alibi witnesses—"my position has been that those persons either *needed to contact me* so that I can interview them to determine whether or not they would be alibi witnesses."  And what little Cross did to investigate those witnesses was fruitless because of his own mistake of fact about when the crime occurred.  At trial, Cross asked Hewittel about his whereabouts only between 12:00 and 12:30 p.m. on the day of the crime.  And at the post-conviction hearing—in response to a question from Hewittel himself—Cross admitted that, "[m]ore than likely," his understanding of the "time frame" for the crime came "from the police report because, at that time, that's all I had."  That police report put the time of the crime at "12:35 p.m."  But the report was not all Cross had, because he had been present at the preliminary exam a month later— where Lemon testified under oath that the time of the crime was 1:30 or 1:45 p.m.  Cross's mistake of fact, then, was his belief that the "time frame" for the crime was the one he asked Hewittel about at trial:  12:00 to 12:30 p.m.

What Cross did to investigate alibi witnesses, in turn, was to talk to Sheila Jackson and, almost certainly, to Leon.  As noted above, Jackson stated in an affidavit that she returned home from church (and saw Hewittel and Leon there) between 1:15 and 1:30 p.m.—almost exactly when Lemon said the crime had occurred.  And as to Cross's conversation with Jackson, Cross admitted (again in response to a question from Hewittel at the post-conviction hearing): "Based upon that conversation *and the time frame that I used in that conversation*, Ms. Jackson could not place you with her at that same time frame."  Cross told the court the same thing before jury selection.  On the basis of his own mistake of fact, therefore, Cross dismissed Jackson out of hand as an alibi witness.

Cross did the same with Leon—who knew Cross as a family friend, and who testified that Cross had likewise rejected him as an alibi witness (on the ground that he would "lie").  And given that Cross never spoke to Mark McCline, Leon was almost certainly "the gentleman" about whom Cross said at the outset of trial that, "in spite of his testimony, he would not be an

alibi witness either." For Leon too had said that he arrived at his father's home around 1:15 p.m. that day, rather than during Cross's "time frame." Cross's failure to take these witnesses seriously thus "resulted from inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 526 (2003). And given that Sheila Jackson was in frequent contact with Kelly McCline before trial, Cross easily could have connected with Mark McCline, had he not dismissed Sheila out of hand.

The Court of Appeals nonetheless held that Cross's "failure to call alibi witnesses was not objectively unreasonable." 2018 WL 2121478 at *6. Respectfully, however, that court simply recited Cross's version of events and then pronounced his performance adequate. *See id.* And in doing so the court made the same mistake of fact that Cross did. As to Jackson in particular, the court asserted that, "given the opportunity to testify, she may have perjured herself." *Id.* As shown above, however, that assertion is flatly contradicted by the record here. The state court's determination that Cross's "failure to call alibi witnesses was not objectively unreasonable," therefore, was itself "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Cross's performance as to alibi witnesses was objectively unreasonable as defined by *Strickland*. *Strickland*, 466 U.S. at 691.

2.

As to the prior-convictions and alibi-witnesses issues alike, therefore, Cross's representation of Hewittel was constitutionally deficient. Hence we must ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. We therefore consider the cumulative effect of Cross's deficient performance.

The Court of Appeals addressed part of that question, namely whether Cross's failure to exclude Hewittel's prior convictions prejudiced him at trial. But the Court of Appeals considered whether Cross's deficient performance amounted to prejudice as defined by Michigan Court Rule 6.508(d)(3)(b)—which, as noted above, differs in some respects from the *Strickland* definition. And here our determination of prejudice is cumulative, rather than limited to the

prior-convictions issue alone.  Whether we owe any deference to the court's determination on that point, therefore, is unclear.

We need not decide whether we owe any deference to that determination, however, because in any event we conclude that Hewittel has shown the requisite prejudice.  Hewittel's trial, such as it was, was strictly a credibility contest between Hewittel and Lemon; the prosecution otherwise lacked any evidence, physical or otherwise, connecting Hewittel to the crime.  Yet Cross himself impeached Hewittel's credibility with his prior convictions—thereby allowing the prosecution to do the same—and then failed to bolster it with testimony from Sheila Jackson, or Leon, or anyone else.  Even the Court of Appeals recognized that "[a]llowing the jury to learn that defendant had previously been convicted of armed robbery five times substantially increased the risk of unfair prejudice to defendant, particularly where defendant was presently charged with armed robbery."  2018 WL 2121478 at *5.  As the prosecution emphasized in closing, that blunder caused Hewittel to admit "out of his own mouth" that he had been convicted five times for the very crime he was accused of.  True, the Court of Appeals ultimately found no prejudice as defined by the Michigan court rule, because the court thought that "the prosecution had a strong case," given Lemon's "unwavering testimony" that Hewittel was present at the crime scene.  *Id.* at *6.  That sets a notably low bar for what counts as a "strong case"—and, on this record, likely would amount to an unreasonable application of *Strickland* if we were to treat it as such.

But we here consider the cumulative effect of Cross's mistakes.  In doing so, we decide de novo the prejudicial effect of Cross's failure to call any alibi witnesses, since the Court of Appeals never addressed that question.  *See Rompilla*, 545 U.S. at 390.  A trial without Cross's mistakes indisputably would have been much harder for the prosecution than the trial was here.  Common to both would have been that the prosecution's only evidence of guilt was Lemon's testimony.  And a trial in which the jury did not hear (again and again) about Hewittel's prior convictions, but instead heard Sheila Jackson's testimony that Hewittel was at home with Leon at the time of the crime, when she returned there from church—would itself have been one in which there would have been "a reasonable probability" that the result "would have been different."  *Strickland*, 466 U.S. at 694.  For in that event the contest would have been Lemon's

word against both Hewittel's and Jackson's, with Hewittel unencumbered by his prior convictions for armed robbery.

The likelihood of a different result would have been even stronger if Cross had allowed Leon to testify as well, since that would have pitted three witnesses against one in a pure credibility contest. And if Mark McCline had testified—which, as explained above, he would have, had Cross not dismissed Jackson out of hand—Hewittel would have had a strong probability of acquittal. McCline was a disinterested witness who missed a day's work to testify and arranged for someone to watch his children, simply because he chose to honor his subpoena. His testimony would have directly supported Hewittel's alibi. McCline's testimony would have powerfully corroborated Leon's testimony as well. McCline's testimony also included details— like his encounter with Leon, and Hewittel's assurance, as he looked up from inside McCline's car, that Leon was "my son"—that would have been hard to make up if they were not true. And McCline had no reason to make anything up.

Thus, even if one assigns to Cross's prior-convictions deficiency the same measure of prejudice that the state court assigned to it—namely, a "substantially increased risk of unfair prejudice" to Hewittel—that mistake, when combined with Cross's failure to call any alibi witnesses, resulted in prejudice as defined by *Strickland*. The trial here was an extreme malfunction in the criminal-justice system. *Harrington*, 662 U.S. at 102. The district court was right to grant the writ.

\*　　\*　　\*

The district court's judgment is affirmed.